JACK HARRIS et al., Appellants, v SHEARSON HAYDEN STONE, INC., Respondent.

First Department, July 9, 1981

##### APPEARANCES OF COUNSEL

*Samuel L. Newman* of counsel *(Leon S. Harris* with him on the brief; *Northrop & Jessop,* attorneys), for appellants.

*Chester J. Straub* of counsel *(Francis J. Menton* and *Joseph T. Baio* with him on the brief; *Willkie Farr & Gallagher,* attorneys), for respondent.

##### OPINION OF THE COURT

SULLIVAN, J.

Defendant Shearson Hayden Stone, Inc., a securities and commodities broker, sued by two of its customers, Dr. & Mrs. Harris, for breach of fiduciary duty in the handling

of their commodities account, successfully moved at Special Term (102 Misc 2d 635) to compel arbitration and to stay the action pending determination of the arbitration proceeding. Plaintiffs have appealed. The issue is the arbitrability of the dispute.

The complaint is styled as a class action, putatively brought on behalf of "all of the commodity customers of 'Shearson', who during the period beginning January 1st, 1978 and thereafter continuing to date, maintained brokerage accounts at the offices [of] Shearson located in New York State, and were not given interest on funds held by Shearson." Two causes of action are alleged. The first charges defendant with the failure, even on request, to invest customers' funds held by it, so as to allow interest to accrue for the benefit of its customers. The second cause of action revolves around defendant's practice of making remittances to its customers who reside in New York by drawing checks on out-of-State banks, thereby receiving the benefit of a longer "float" period between the time the check is drawn and when it is ultimately presented for payment. Thus, in addition to having the use of the customers' funds for the longer period of time that it takes for the checks to clear, defendant receives the additional interest derived therefrom, which presumably represents a significant sum when the aggregate number of all such transactions is considered. An accounting is sought for each of these causes of action as well as injunctive relief.

The underlying contract between the parties, known as a customer's agreement, which both plaintiffs signed, calls for the arbitration of "[a]ny controversy arising out of or relating to" the customer's accounts, the transactions between the parties or the agreement itself. At the top of the first page of the document, blocked off in capital letters and separated from the body of the agreement by over an inch of blank space is the caution, "PLEASE READ CAREFULLY, SIGN AND RETURN." Thus, we note initially that the facts here are not at all comparable to those in *Matter of Riverdale Fabrics Corp. (Tillinghast-Stiles Co.)* (306 NY 288) where enforcement of an arbitration agreement which was incorporated by reference into a contract was denied. The court noted that the form of language used in the standard con-

tract "appears to have been designed to avoid any resistance that might arise if arbitration were brought to the attention of the contracting parties as the exclusive remedy in case of disputes." *(Supra,* at p 292.)

Plaintiffs argue, instead, that the arbitration agreement is unenforceable because it is violative of Federal public policy which proscribes the use of a clause in a customer's brokerage agreement which relegates to arbitration all future disputes between the parties. They also contend that the public policy of this State mandates that claims of fiduciary misconduct be subjected to judicial scrutiny and not mere arbitral review.

As evidence of the public policy against arbitration agreements between a securities broker and its customers, plaintiffs cite a release of the Securities and Exchange Commission which concluded that "[r]equiring the signing of an arbitration agreement without adequate disclosure as to its meaning and effect violates standards of fair dealing with customers and constitutes conduct that is inconsistent with just and equitable principles of trade." (Securities & Exch. Comm. Release No. 34-15984, 44 Fed Reg 40462, 40464 [No. 133, July 10, 1979].) We note that the release, issued more than two years after the parties executed the customer's agreement, does not propose the voiding of arbitration agreements such as the one here involved. Moreover, as is shown, *infra,* decisional law on the issue of the validity of arbitration provisions in customer's brokerage agreements provides neither a legal basis for, nor the compelling public policy argument to justify, the complete avoidance of this arbitration agreement.

In *Matter of Bear, Stearns & Co. (Weiss)* (104 Misc 2d 876, 878), upon which plaintiffs rely, the court held that an agreement which "fails to distinguish between disputes which are subject to arbitration and those which are not * * * is in contravention of Release No. 34-15984 and shall not be enforced by the court." In so ruling, the court cited *Wilco v Swan* (346 US 427) which held that a predispute arbitration clause was not enforceable when applied to a claim arising under the civil liability provisions of the Securities Act of 1933 (US Code, tit 15, § 77a *et seq.)* for alleged misrepresentation in the sale of securities. Noting

that section 14 of the Securities Act (US Code, tit 15, § 77n) specifically prohibits any stipulation waiving compliance with any of the act's provisions the Supreme Court found that "the intention of Congress concerning the sale of securities is better carried out by holding invalid * * * an agreement for arbitration of issues arising under the Act." *(Wilko v Swan, supra, at p 438.)*

The statutory restriction on arbitration does not, however, apply to claims which do not involve a violation of the Federal securities laws. Thus, the Federal courts, faced with allegations of breach of fiduciary duty, have enforced the arbitration agreement between the parties, even where the arbitration agreement, like the one here, would, by its terms, appear to govern nonarbitrable claims under the Securities Act. (See, e.g., *Matter of Conticommodity Servs.* *[Philipp & Lion]*, 613 F2d 1222; *Sibley v Tandy Corp.*, 543 F2d 540, 542-543, cert den 434 US 824; *De Hart v Moore*, 424 F Supp 55, 56-57.)

This court reached a similar conclusion in *Barbi v Hutton & Co.* (53 AD2d 562). There, the plaintiff loaned $77,000 to the defendant, a brokerage firm, pursuant to the terms of a cash subordination agreement which also provided that any controversy arising thereunder would be submitted to arbitration under the rules of the New York Stock Exchange. The plaintiff commenced an action on the contract. In response to the defendant's motion for a stay of the action based on the arbitration clause, the plaintiff, asserting that the agreement was a security, contended that under *Wilko (supra)* she could not be compelled to arbitrate. In finding the arbitration provision controlling, we held: "*Wilko* is not the absolute bar to arbitration of security controversies claimed by the plaintiff. It is applicable, not to common-law actions such as this, but to claims arising under the Securities Act of 1933". *(Barbi v Hutton & Co., supra,* at p 563, citing *Scherk v Alberto-Culver Co.*, 417 US 506.) Thus, *Wilko* does not bar arbitration of the common-law claims which plaintiffs have asserted in this action.

Plaintiffs urge that on the basis of the decision in *Matter of Bear, Stearns & Co. (Weiss)* (104 Misc 2d 876, *supra)* this court should retreat from its earlier decision in *Barbi (supra)*, depart from an unbroken claim of Federal court

precedent, and hold that the present agreement to arbitrate is unenforceable for all purposes. As already noted, *Weiss* relied on a release issued by the Securities and Exchange Commission (Securities & Exch. Comm. Release No. 34-15984). Significantly, in the period since the issuance of the release, no court, with the exception of *Weiss*, has ever relied upon it to vitiate an arbitration agreement in a dispute limited to common-law claims. Where the claims asserted do not involve Securities Act violations, broad predispute arbitration clauses in brokerage house customer agreements continue to be enforced, even where no mention of nonarbitrability of Securities Act claims is made. (See *Matter of Conticommodity Servs.* [*Philipp & Lion*], 613 F2d 1222, *supra.*)

Moreover, adherence to the *Barbi* rationale does not result in a curtailment of any rights under the Securities Act. Under *Wilko* (346 US 427, *supra*) Federal securities claims must be litigated in a judicial forum. Where a complaint alleges both Federal securities and common-law claims, the court will stay adjudication of the Federal securities claims until the common-law claims are resolved in arbitration. (See *Sibley v Tandy Corp.*, 543 F2d 540, 543-544, *supra*; see, also, *Fox v Merrill Lynch & Co.*, 453 F Supp 561, 567.) *

Plaintiffs also claim that the public policy of this State precludes arbitration of the present dispute. It is well established in New York that absent some prohibition derived from constitutional, statutory or common-law principles arbitration is a permissible forum for dispute resolution. *(Matter of Port Jefferson Sta. Teachers Assn. v Brookhaven-Comsewogue Union Free School Dist.*, 45 NY2d 898, 899-900; *Matter of Board of Educ. v Yonkers Federation of Teachers*, 40 NY2d 268, 271.) Our courts have not hesitated to find certain issues outside the scope of arbitration. For instance, child custody cases, which require a sensitive balancing of factors determinative of a child's best interests, have been held to be best left ex-

---

* Of course, if it is impossible, or at least impractical to separate Federal securities claims for arbitrable claims, a court should deny arbitration to preserve its exclusive jurisdiction over the Federal Securities Act claims. *(Shapiro v Jaslow*, 320 F Supp 598.)

clusively to the judicial process. (See *Nestel v Nestel*, 38 AD2d 942, 943.) The distribution of an estate cannot be the subject of arbitration. *(Matter of Jacobovitz*, 58 Misc 2d 330.) Criminal violations, for obvious reasons, have been excluded from the ambit of arbitration. *(Matter of Goldmar Hotel Corp.* [*Morningside Studios*], 283 App Div 935.) But the conduct of a fiduciary has never been held to fall within that class of issues which are nonarbitrable for public policy reasons. In fact, the Court of Appeals has explicitly found a claim of breach of fiduciary duty to be arbitrable. (See *Matter of Lane* [*Abel-Bey*], 50 NY2d 864.)

The dissenters view this appeal in terms of a conflict between two countervailing public policies, arbitration and class action. The difficulty with this analysis is that it overlooks the strong public policy which underlies arbitration. That policy, embodied in CPLR article 75 and the plethora of judicial decisions holding that arbitration must be compelled upon application, except in certain limited circumstances not applicable here, is succinctly stated in CPLR 7503 (subd [a]) : "Application to compel arbitration; stay of action. A party aggrieved by the failure of another to arbitrate may apply for an order compelling arbitration. When there is no substantial question whether a valid agreement was made or complied with * * * the court shall direct the parties to arbitrate." The Court of Appeals has recognized that the grounds which may be asserted to defeat arbitration are limited. "When arbitration is invoked the only questions to be resolved by the courts (unless the dispute is barred by the Statute of Limitations) are whether 'a valid agreement was made' and whether such agreement was 'complied with' (CPLR 7503)." *(Matter of Prinze* [*Jonas*], 38 NY2d 570, 574.) Defendant established that a valid arbitration agreement had been made and that the conditions precedent to arbitration had been complied with. Indeed, plaintiffs have not offered any factual allegations addressed to either issue. Their only opposition to the application to stay arbitration was an affirmation by their attorney in which he argued that the agreement to arbitrate, made by plaintiffs individually, could not be binding on a class.

"[T]his State favors and encourages arbitration as a means of conserving the time and resources of the courts and the contracting parties." *(Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Amer.*, 37 NY2d 91, 95; see *Matter of Maye [Bluestein]*, 40 NY2d 113.) Moreover, "[p]arties to a contract may agree, if they will, that any and all controversies growing out of it in any way shall be submitted to arbitration. If they do, the courts of New York will give effect to their intention." *(Matter of Marchant v Mead-Morrison Mfg. Co.*, 252 NY 284, 298.) "It has long been this State's policy that, where parties enter into an agreement and, in one of its provisions, promise that any dispute arising out of or in connection with it shall be settled by arbitration, any controversy which arises between them and is within the compass of the provision must go to arbitration." *(Matter of Exercycle Corp. [Maratta]*, 9 NY2d 329, 334, citing cases.)

Of course, "[n]o one is under a duty to arbitrate unless by clear language he has agreed to do so." *(Matter of Arthur Philip Export Corp. [Leatherstone, Inc.]*, 275 App Div 102, 104, citing cases.) "Though the principle of arbitration in commercial disputes is a sound one and should be encouraged, no one may be compelled to give up his right to resort to established judicial tribunals with all of their safeguards unless he has agreed by a writing to do so." *(Supra*, at p 104.) Plaintiffs, however, do not claim that they did not voluntarily agree to arbitration. And, as already noted, the agreement itself cautions the contracting party to read the document before signing.

The dissenters would allow plaintiffs to avoid their agreement to arbitrate because they have alleged a breach of fiduciary duty, the consequences of which would adversely affect a significant number of defendant's customers. No authority is cited to support the argument that the mere allegation of breach of fiduciary duty urged on behalf of a putative class justifies excusing a party from a contract validly made.

The proposition that by the naked assertion of such a claim a party can evade an arbitration agreement fails because it would require the rejection of arbitration for reasons other than those set forth exclusively in CPLR

7503. The dissent argues, however, that the significance of the availability of the class action device outweighs the substance of an otherwise valid agreement to arbitrate. CPLR 7503 allows for no such balancing of interests, and indeed specifically precludes any balancing not addressed to the validity of the agreement itself. Thus, although no case in this State has previously addressed the question of the effect of class action allegations on arbitrability, the CPLR provides a definitive answer to that question.

Even were a balancing of interests permissible, it is clear, however, as Special Term found (102 Misc 2d 635, *supra*), that the interests favoring arbitration should prevail over those favoring the class action, both in general and in the present instance. In other jurisdictions where a weighing of interests has been undertaken, the courts have consistently held that arbitration will be compelled despite class action allegations. (See, e.g., *Vernon v Drexel Burnham & Co.*, 52 Cal App 3d 706; *Frame v Merrill Lynch, Pierce, Fenner & Smith*, 20 Cal App 3d 668; see, also, *Gordon v Thor Power Tool Co.*, 55 Ill App 2d 389.)

In *Vernon v Drexel Burnham & Co. (supra)* the facts were remarkably similar to those in the present action. The plaintiffs had brought a putative class action against Drexel Burnham, a securities firm, seeking recovery of alleged excess margin interest charges. Drexel Burnham moved to compel arbitration with the individual plaintiffs pursuant to the terms of its customer agreement. The court weighed the conflicting policies favoring class actions against those favoring arbitration, and held that arbitration prevailed. The language of the court is instructive and will be quoted at length:

"We hold that, in the instant case, the policy of law favoring arbitration prevails over the policy of law pertaining to class actions for the following reasons:

"*First*, clearly arbitration is a recognized and favored means by which parties expeditiously and efficiently may settle disputes which might otherwise take years to resolve * * * There is a strong public policy in favor of arbitration agreements and the law is designed to encourage persons 'who wish to avoid delays incident to a civil action to obtain

an adjustment of their differences by a tribunal of their own choosing.' * * * Arbitration provides a means of giving effect to the intention of the parties, easing court congestion, and providing a method more expeditious and less expensive for the resolution of disputes. * * *

"*Second*, there is perhaps no higher public policy than to uphold and give effect to contracts validly entered into and legally permissible in subject matter. The arbitration provision in the instant case is an integral part of a valid and enforceable contract. The sanctity of valid contractual agreements in a free society, such as ours, is of paramount importance and is rooted in both the United States and California Constitutions, which predate and outweigh the body of law on class actions as presently evolving.

"*Finally*, the substantive law of contractual agreement takes precedence over the class action, which is merely a procedural device for consolidating matters properly before the Court. 'Class actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends — to sacrifice the goal for the going.' " (*Vernon v Drexel Burnham & Co., supra,* at pp 715-716.)

Insofar as these plaintiffs are concerned, arbitration provides a relatively uncostly procedure for resolving their dispute with defendant. Concededly, if no arbitration agreement existed plaintiffs might have a strong case for class action certification, since the institution of an individual lawsuit for the paltry sum at issue would be self-defeating. (Cf. *Gilman v Merrill Lynch, Pierce, Fenner & Smith,* 93 Misc 2d 941.) But, maintenance of a class action here by assertion of a claim for which a forum is provided elsewhere, would defeat the aim of arbitration, and undercut an avowed purpose of the class action itself — the "conservation of judicial effort." (See Governor's Memoranda, NY Legis Ann, 1975, p 426.)

We have examined plaintiffs' other contentions and find them to be without merit.

Accordingly, the order of the Supreme Court, New York County (MERCORELLA, J.), entered February 8, 1980, should be affirmed without costs or disbursements.

SANDLER, J. (dissenting). Although tightly reasoned and logically impeccable, the majority opinion does not seem to me to come to grips with the important, difficult problem inherent in this litigation. In fairness, it must be acknowledged that the record on appeal does not include facts important to an understanding of the issue, although these are generally known and not in dispute, and that the arguments presented by appellants are in part misdirected. Some background may be helpful.

The individual plaintiffs would not have been permitted to open an account with the defendant if they did not subscribe to an agreement embodying an arbitration clause. Nor would any of the defendants' other customers, the proposed class, have been permitted to open accounts without subscribing to such an agreement. As a practical matter no one, whether the plaintiffs, the rest of the class, or anyone else, may open accounts with securities and commodities brokers if they do not agree to surrender their right to litigate in court disputes arising out of such an arrangement. In short, a major area of economic activity is closed to anyone not willing to agree to arbitrate.

I doubt very much that the strong public policy in favor of arbitration referred to in the majority opinion, to which I wholeheartedly subscribe, was shaped with regard to arbitration agreements entered into under such circumstances.

Notwithstanding the above, the law is firmly established that such agreements are enforceable, and I do not disagree with that body of authority. The character of the securities market makes it appropriate for the usual dispute to be resolved by arbitration rather than in the courts.

The facts here present a disturbing complication. As the majority opinion acknowledges, absent the arbitration agreement, "plaintiffs might have a strong case for class action certification, since the institution of an individual lawsuit for the paltry sum at issue would be self-defeating."

The point may be appropriately phrased much more strongly. Whatever ultimate conclusion may be reached with regard to the merits of the issues sought to be raised, it seems quite evident that a class action is clearly the most

appropriate means for adjudicating them and remedying whatever wrongs may be established. As already noted, the sum in question is likely to discourage most if not all of the allegedly aggrieved persons from incurring the expense of prosecuting even an arbitration proceeding. The nature of arbitration proceedings makes it unlikely that a successful determination in favor of one person would result in restitution to the others. Indeed there is no assurance that a successful determination in favor of a single complainant would alter the practices here challenged.

In short, not only does a class action appear to be the most suitable means for addressing the issues presented, but there are compelling reasons to believe that individual arbitration proceedings would be wholly ineffective to redress whatever wrongs may be found to have occurred.

As the majority opinion notes, arbitration agreements have not been enforced with regard to various kinds of issues which have been felt to be more appropriately resolved in court. Considerations of public policy in favor of denying enforcement to the arbitration agreement here seems to me no less compelling than in the situations described in the majority opinion.

In the context of an industry-wide practice that excludes effective participation to anyone who does not agree to arbitrate, there is surely a strong public policy for denying enforcement to the arbitration agreement with regard to disputes clearly more appropriately resolved in a class action and as to which individual arbitrations are unlikely to prove an effective remedy even if the wrongs alleged are established.

No doubt there is a risk that the principle here urged may be abused. It is difficult to estimate how serious the risk is, although I doubt that it is substantial. The common run of arbitration litigation involves commercial disputes between business entities of a kind clearly unsuited to class action and adequately addressed in arbitration.

Accordingly, I am in agreement with Justice BLOOM to the extent to which he would reverse and deny the motion to compel arbitration, subject to renewal of the application in the event that class action status is denied. I would

modify that recommendation, however, to remand the instant motion to be determined at Special Term, together with an application for class action status. The issues presented are closely linked. Assuming that it is determined that the instant action is an appropriate one for class action, the critical question with regard to the motion to stay arbitration should be whether or not an arbitration proceeding would provide an effective means for remedying whatever wrongs may be determined to have occurred.

BLOOM, J. (dissenting). This appeal poses the novel and difficult task of balancing countervailing legal policies. Defendant (Shearson) is a brokerage firm. Plaintiffs are its customers. When plaintiffs entered into that relationship with Shearson they executed an agreement which, among other things provided: "Any controversy arising out of or relating to my accounts, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the National Association of Security Dealers, Inc. or the Boards of Directors of the New York Stock Exchange, Inc. and/or the American Stock Exchange, Inc. as I may elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you may make such election. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof".

Thereafter plaintiffs brought this class action under CPLR article 9, alleging that when Shearson held moneys belonging to members of the class it refused, even upon request, "to invest the said funds so as to allow interest to accrue on the same for the benefit of the members of the class. By so doing, Shearson had use of funds but belonging to members of the class for one or more days". Additionally, the complaint alleges that when Shearson, "as broker for the members of the aforesaid class, held funds which were to be remitted to class members, said funds were intentionally remitted to class members by check drawn on Shearson accounts in banks located outside of the State of New York and not on its accounts in banks located in the State of New York, and by so doing, Shearson had use

of funds belonging to members of the class for one or more days longer than it would have, had it issued checks drawn on its accounts in banks located in the State of New York". In sum, plaintiffs' complaint, which contains three causes of action, the first two of which are bottomed upon breach of a fiduciary relationship and the third of which seeks injunctive relief, is based upon the thesis that Shearson's actions are illegal and improper and seek to obtain for Shearson the benefit of the "float". In so doing it deprived the members of the class of the potential earnings to be derived from use of the funds for the "float" periods.

Based upon the arbitration provision of the contract between the parties Shearson moved, before answer, to compel arbitration and to stay the action pending such arbitration. Special Term, relying on a California case *(Vernon v Drexel Burnham & Co.*, 52 Cal App 3d 706), granted the motion (102 Misc 2d 635). It made (p 636) "no determination as to the maintenance of the class action itself".

We are thus brought face to face with a conflict between two policies, both of which are favored by the law. It is indisputable that the courts of our State encourage and favor arbitration as a means of conserving time and to husband scarce judicial resources *(Matter of Maye [Bluestein]*, 40 NY2d 113, 117-118; *Matter of Nationwide Gen. Ins. Co. v Investors Co. of Amer.*, 37 NY2d 91, 95). It is equally true that the law looks with favor upon class actions (see Twenty-first Ann Report of NY Judicial Conference, 1976, p 248 *et seq.*). Indeed, of such consequence was the class action thought to be that, after thoroughgoing study, the law governing it was completely revised. Like arbitration it conserves judicial resources by obviating the possibility of repetitious litigation. It also serves the purpose of providing claimants with a method of obtaining redress for claims which otherwise would be too small to warrant individual litigation (2 Weinstein-Korn-Miller, NY Civ Prac, par 901.01; see, also, *Eisen v Carlisle & Jacquelin*, 417 US 156; *Gilman v Merrill Lynch, Pierce, Fenner & Smith,* 93 Misc 2d 941).

When such conflict of policies occurs the law cannot abdicate. A choice must be made or, if feasible, a new policy

declared which will harmonize the conflict. Chief Judge CARDOZO, with his customary felicity, pointed the way, and by illustration, demonstrated that, when choice is to be made, the alleged wrongdoer is not to be favored. "The directive force of logic does not always exert itself, however, along a single and unobstructed path. One principle or precedent, pushed to the limit of its logic, may point to one conclusion; another principle or precedent, followed with like logic, may point with equal certainty to another. In this conflict, we must choose between the two paths, selecting one or other, or perhaps striking out upon a third, which will be the resultant of the two forces in combination, or will represent the mean between extremes. Let me take as an illustration of such conflict the famous case of Riggs v. Palmer, 115 N.Y. 506. That case decided that a legatee who had murdered his testator would not be permitted by a court of equity to enjoy the benefits of the will. Conflicting principles were there in competition for the mastery. One of them prevailed, and vanquished all the others. There was the principle of the binding force of a will disposing of the estate of a testator in conformity with law. That principle, pushed to the limit of its logic, seemed to uphold the title of the murderer. There was the principle that civil courts may not add to the pains and penalties of crimes. That, pushed to the limit of its logic, seemed again to uphold his title. But over against these was another principle, of greater generality, its roots deeply fastened in universal sentiments of justice, the principle that no man should profit from his own * * * wrong. The logic of this principle prevailed over the logic of the others" (Cardozo, The Nature of the Judicial Process, pp 40-41; see, also, as illustrative of the principle, *Servido v Superintendent of Ins.*, 77 AD2d 70).

So, too, in this case the logic of the class action ought prevail over the logic of arbitration. While the loss to the class by reason of Shearson's actions may aggregate millions of dollars, the loss to each member of the class may well be so miniscule as to make it scarcely practical to resort to arbitration with the expense incident thereto. Indeed, were it not for the class action the practicality of litigation would be substantially nonexistent.

It is scarcely an answer to assert that plaintiffs could have sought an agreement which did not contain an arbitration clause. It is a matter of common knowledge that substantially all agreements entered into by brokerage houses contain such clauses. In substance, the alternatives open to plaintiffs were to sign the agreement or to abstain from market trading.

Nor is it an answer to assert that the dispute between plaintiffs and Shearson may be proceeded with as a "class arbitration". Arbitration does not lend itself to the many subsidiary proceedings incident to an ongoing class action, e.g., determination of whether class action status should be granted, definition of the class, determination of the nature and kind of notice and by whom it should be sent, provision for opting out, etc. In sum, if the matter is to proceed in arbitration it must proceed as an individual claim. Thus the reality is that the effect of decreeing that plaintiffs' claims proceed by arbitration is to immunize the practice followed by Shearson from scrutiny by anyone. It is to recognize the existence of a right while denying any practical remedy. That is a result to which I cannot subscribe. By consequence, I would reverse the order compelling arbitration.

It is necessary to reiterate that the motion was made before answer. Hence, there has been no determination of whether the action is entitled to class action status. At this point in time, therefore, we cannot know whether a motion for class action status will be granted or denied.

Accordingly, I would reverse and deny the motion to compel arbitration and to stay the action without prejudice, however, to the reservation of the claim of the right to arbitration by way of answer and the right to renew the application to compel arbitration and stay the action in the event that class action status is denied.

ROSS and FEIN, JJ., concur with SULLIVAN, J.; SANDLER and BLOOM, JJ., dissent in separate opinions.

Order, Supreme Court, New York County, entered on February 8, 1980, affirmed, without costs and without disbursements.